**IN THE UNITED STATES DISTRICT COURT**
**FOR THE WESTERN DISTRICT OF NORTH CAROLINA**
**CHARLOTTE DIVISION**
**CIVIL ACTION NO. 3:15-CV-309-DCK**

| | | |
|---|---|---|
| **GENGER POOLE, as Administrator of** | ) | |
| **the Estate of William Dean Poole,** | ) | |
| | ) | |
| **Plaintiff,** | ) | |
| | ) | |
| **v.** | ) | **ORDER** |
| | ) | |
| **GASTON COUNTY; W. P. DOWNEY;** | ) | |
| **and J. E. KNUPP,** | ) | |
| | ) | |
| **Defendants.** | ) | |
| | ) | |

**THIS MATTER IS BEFORE THE COURT** on "Defendant Gaston County's Motion For Summary Judgment" (Document No. 101); the "Motion For Summary Judgment Of Defendants J.E. Knupp, W.P. Downey, T.R. Earl, and A.O. Holder" (Document No. 103); and "Defendants' Motion To Strike Affidavit Of J.C. Dowell, Jr. [#113-1]" (Document No. 123). The parties have consented to Magistrate Judge jurisdiction pursuant to 28 U.S.C. § 636(c), and these motions are now ripe for disposition. Having carefully considered the motions, the record, applicable authority, and the arguments of counsel at a hearing on September 13, 2017, the undersigned will grant the motions for summary judgment and deny the motion to strike as moot.

## I. BACKGROUND

### A. Facts

The facts of this matter are undeniably tragic. On March 16, 2015, William Dean Poole ("Mr. Poole") "was at his residence located at 130 Wedowee Lane, Gaston County, North Carolina." (Document No. 2, ¶ 21). At about 3:15 p.m., Mr. Poole's wife, Genger Poole ("Plaintiff") arrived home and "Mr. Poole communicated to her that he was in a great deal of pain."

Id.  See also, (Document No. 26, p.6) ("he was in extreme pain").  According to Plaintiff, "Mr. Poole contacted the Veteran's Affairs Suicide hotline and made demands for pain medications and threats he would harm himself."  (Document No. 2, ¶ 22).  See also, (Document No. 26, p.6) ("Poole expressed suicidal ideations").

Plaintiff has previously asked the Court to take judicial notice of a 911 call made by the National Veteran's Crisis Line that began at 5:05:42 p.m. on March 16, 2015, and which has also been attached to Defendant Gaston County's pending motion.  See (Document No. 26, pp.4-6; and Document No. 101-1, pp.2-3).  The transcript of that 911 call indicates that the "Caller" from the National Veteran's Crisis Line informed the "Dispatcher" at Gaston County Communications (or 911) that there was a veteran on the phone "saying that he's suicidal."  (Document No. 26, p.4; and Document No. 101-1, p.2).  The Caller further relayed to the Gaston County Dispatcher:  Mr. Poole's address on Wedowee Lane;  that he was upset with his doctor for taking pain medication away;  that he had over 400 guns on his premises;  that he planned to shoot himself;  that if police come to his house it won't end well;  and that he was talking about taking out others before himself. (Document No. 26, p.5;  and Document No. 101-1, p.2).  In addition, the Caller reported that Mr. Poole had been walking around with a .357 in his hand and that he lived with his wife.  Id.  The Dispatcher stated "we'll get police and paramedics started that way."  (Document No. 26, p.5;  and Document No. 101-1, p.3).  The call ended at 5:10:10 p.m. (Document No. 26, p.6;  and Document No. 101-1, p.3).

"Following the conversation, Gaston County police were called to complete a wellness check on Mr. Poole who reported as a suicidal individual who did not wish for the police to be

summoned." (Document No. 2, ¶23).[1]  Apparently, soon after the conversation with the National

Veteran's Crisis Line, Mr. Poole informed Plaintiff and his son-in-law that he was going to visit

his grandchildren who also lived on Wedowee Lane.  See (Document No. 2, ¶24;  (Document No.

108-3, ¶¶ 13-14).  "Mr. Poole was disabled due to severe back pain caused by a motorcycle

accident and injuries sustained in the terrorist attack against the Marine barracks in Beirut."

(Document No. 2, ¶17).  As such, Mr. Poole's "normal mode of transportation in his neighborhood

was his John Deere lawnmower."  (Document No. 2, ¶¶18-19);  see also (Document No. 108-3,

¶15).

At the same time the Caller from the National Veteran's Crisis Line was sharing

information about Mr. Poole with Gaston County Communications, Catrina Love ("Love") at the

Communications Center was entering a description of the call into the Computer Aided Dispatch

("CAD") system.  (Document No. 102, p.2);  see also (Document No. 101-2).  The CAD

description advised Gaston County responders that Poole:

> "says he plans on shooting himself...has a lot of guns in the house
> and will shoot police if they come"…" he was walking around last
> night w/a 357 in his hands...has been going on for the past few
> nights" ..."pt. has PTSD"..." he has a wife, not sure if she's (sic)
> there or not." (Exh. B, Detail Call for Service, Bates 10248-10249
> at 10248.

(Document No. 102, p.2).

---

[1]  Plaintiff later filed the "Affidavit Of Genger Poole" (Document No. 108-3) that contradicts parts of the transcript of the call to Gaston County Communications *and* her own verified Complaint - most notably stating that Mr. Poole was not threatening to commit suicide.  Compare (Document No. 2, ¶¶ 22-23), (Document No. 26, pp.4-6), and (Document No. 108-3, ¶¶ 9 and 18).  Plaintiff has never sought leave to amend her Complaint which, as noted above, states that Poole called a "[s]uicide hotline threatening to "harm himself" and "reported as a suicidal individual."  Id.

Gaston County Police Department ("GCPD") dispatched Officers Erin M. Williams ("Williams") and Jeff Bryant ("Bryant"). (Document No. 102, p.3). Additional GCPD officers also responded to the situation at Mr. Poole's address, including Defendants W. P. Downey ("Downey"), J. E. Knupp ("Knupp"), T. R. Earl ("Earl"), and A. O. Holder ("Holder"). (Document No. 2, ¶¶25-27); see also (Document No. 102, p.3).

> Defendant Earl, who was on patrol duty and was at the desk in the police station when the initial call came in. (Exh. J, *Earl Depo* at 15). After hearing the seriousness of the call, Defendant Downey responded **given his training as a crisis negotiator**. (Exh. D, *Downey Depo.* at 20-21, 43). Defendant Holder responded due to the nature of the call, and as a K-9 handler, he usually responds to serious calls. (Exh. K, *Holder Depo.* at 13, 16, 32-33). Defendant Knupp was the Sergeant in charge of the area where Poole's residence is located. (Exh. L, *Knupp Depo.* at 50-51). While en route, Defendant Downey called Officer Brian Rogers who was also an ERT negotiator and discussed having Officer Rogers in communications or at the scene. (Exh. D, *Downey Depo. Trans.* at 21, 42). Defendant Knupp was informed that Rogers was coming to the scene and **medical personnel were staging until the police had secured the scene**. (Exh. L, *Knupp Depo.* at 44; Exh. D, *Downey Depo.* at 91). **Attempts were made to call Poole back and to try to resolve the situation peacefully**. Exh. D *Downey Depo.* at 103-105.

Id. (Emphasis added). Defendants note that "Gaston Emergency Medical Services will not enter a suicidal suspect scene until it has been secured by police." (Document No. 102, p.3, n.4) (citing Document No. 101-4, p.19; Document No. 101-12, p.11; Document No. 101-13, pp.4-5).

"Upon arriving, officers staged at the entrance to Wedowee Lane." (Document No. 102, p.3). Officers Holder and Bryant observed Mr. Poole exit a mobile home and mount a riding lawn mower, which he drove a short distance before hitting an object. (Document No. 102, p.4). The mower's engine stopped and Mr. Poole got off the mower and looked under the mower. Id. (citing

Document No. 101-11, p.8).  Downey testified that he and Knupp saw this as an opportunity to confront Mr. Poole.  Id. (citing Document No. 101-4, pp.11, 15-16).

Defendants contend that the decision to approach Mr. Poole at this time was based on several factors, including that:  he was alone, thus negating a potential hostage situation;  he was not in a position to barricade himself;  he was away from the large cache of weapons he claimed to own;  no firearm was observed on his person – and the officers thought it was unlikely he would be armed while cutting the grass.  (Document No. 102, p.4) (citing Document No. 101-4, pp.15-16 and Document No. 101-12, pp.9-10).  GCPD officers then "advanced with their weapons in the low ready position."  Id.

Downey and Knupp rounded the end of the mobile home and confronted Mr. Poole, who was facing them while sitting on the mower about ten (10) yards away.  Id.  Knupp began shouting "Police, let me see your hands."  Id.  Meanwhile, Earl and Holder were arriving at the end of the mobile home.  Id.  Mr. Poole "yelled 'why' or 'what for' and immediately leaned back and pulled his shirt up and opened some type of holster."  (Document No. 102, pp.4-5).  Downey then yelled "don't do it, don't do it."  (Document No. 102, p.5).  "Poole then pulled out a pistol, pointed it up into the air, and immediately began lowering the pistol in a motion consistent with gaining target acquisition upon Defendant Officers."  Id.  (citing Document No. 101-4, pp.26-30;  Document No. 101-12, pp.7-8;  Document No. 101-11, pp.11-14;  Document No. 101-10, pp.6-11).

Officers Downey, Knupp, Holder, and Earl then "discharged their weapons in response to Poole's potentially lethal actions."  (Document No. 102, p.5).  Mr. Poole sustained several fatal gunshot wounds, including to the head and the chest, and died immediately.  Id. (citing Document No. 26-5);  see also (Document No. 2, ¶¶ 36-37).  "The entire confrontation lasted approximately three (3) to five (5) seconds."  Id. (citing Document No. 101-4, p.28;  Document No. 101-12, pp.7-

8;  Document No. 101-11, pp.11-14;  Document No. 101-10, p.12).  Officer Earl testified that the period of time between the GCPD officers' first and last shot was "less than a second because, like I said, it sounded like we all fired at the same time."  (Document No. 101-10, p.12).

## B.  Procedure

Plaintiff Genger Poole, as administrator of the Estate of William Dean Poole, initiated this action with the filing of her verified "Complaint" (Document No. 2) on July 17, 2015, against Gaston County, Sergeant J. E. Knupp, Sergeant W. P. Downey, Officer T. R. Earl, and Officer A. O. Holder (together, "Defendants").  The Complaint asserts claims for:  (1) Excessive Force Against Gaston County – Petition for Injunctive Relief;  (2) Excessive Force Against Individual Defendants Downey, Knupp, Earl, and Holder;  (3) Public Entity Liability Against Gaston County;  (4) Assault and Battery;  and (5) violation of the Americans with Disabilities Act ("ADA"). (Document No. 2, pp.5-11).

Defendants filed motions to dismiss on September 28, 2015.  See (Document Nos. 22-25). On August 11, 2016, the Honorable Frank D. Whitney granted the motions to dismiss in part and denied in part.  (Document No. 32).  Judge Whitney determined that the state law claims for assault and battery against Gaston County and its employees in their official capacities must be dismissed due to governmental immunity, and that Defendants' motions should otherwise be denied, without prejudice to reassert their arguments at summary judgment.  Id.

On September 1, 2016, the parties filed their "Certification And Report Of F.R.C.P. 26(f) Conference And Discovery Plan" (Document No. 38).  In that filing, the parties indicated that they consent to the jurisdiction of a U.S. Magistrate Judge in this case.  (Document No. 38, p.2).  On September 7, 2016, the parties filed a "Joint Stipulation Of Consent to Exercise Jurisdiction by a United States Magistrate Judge" (Document No. 52), and this matter was reassigned to the

undersigned Magistrate Judge. The Court then issued a "Pretrial Order And Case Management Plan" (Document No. 58) on September 9, 2016. The "…Case Management Plan" includes the following deadlines: discovery completion – June 16, 2017; mediation report – July 1, 2017; dispositive motions – July 14, 2017; and trial– January 2, 2018. (Document No. 58). The mediation and trial deadlines were later extended. See (Document Nos. 100 and 131). The parties held a mediation with attorney Carl Horn on July 27, 2017, that ended in impasse.

Now pending before the Court are "Defendant Gaston County's Motion For Summary Judgment" (Document No. 101) and the "Motion For Summary Judgment Of Defendants J.E. Knupp, W.P. Downey, T.R. Earl, and A.O. Holder" (Document No. 103) filed on July 3, 2017, as well as "Defendants' Motion To Strike Affidavit Of J.C. Dowell, Jr. [#113-1]" (Document No. 123) filed on July 26, 2017. On July 28, 2017, Plaintiff filed a request for oral argument on the motions for summary judgment, which was allowed by the Court. See (Document Nos. 126 and 128).[2]

On September 12, 2017, after the pending motions were fully briefed and one (1) day before the Court's hearing in this matter, Plaintiff filed her "Stipulation Of Voluntary Dismissal With Prejudice Of Defendants Officer T. R. Earl And Officer A. O. Holder, In Their Individual And Official Capacities" (Document No. 132). The undersigned held a motions hearing on September 13, 2017, and heard arguments from counsel for both sides on all pending motions.

Based on the foregoing, this matter is now ripe for disposition.


## II.     STANDARD OF REVIEW

---

[2] It does not appear that Plaintiff's counsel conferred with Defendants' counsel pursuant to Local Rule 7.1 (B), or that Defendants filed a response pursuant to Local Rule 7.1 (E).

The standard of review here is familiar. Summary judgment shall be granted "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed.R.Civ.P. 56(a). The movant has the "initial responsibility of informing the district court of the basis for its motion, and identifying those portions of the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, which it believes demonstrate the absence of a genuine issue of material fact." Celotex Corp. v. Catrett, 477 U.S. 317, 323 (1986) (internal citations omitted). Only disputes between the parties over material facts (determined by reference to the substantive law) that might affect the outcome of the case properly preclude the entry of summary judgment. Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986). A dispute about a material fact is "genuine" only if the evidence is such that "a reasonable jury could return a verdict for the nonmoving party." Id.

Once the movant's initial burden is met, the burden shifts to the nonmoving party. Webb v. K.R. Drenth Trucking, Inc., 780 F.Supp.2d 409 (W.D.N.C. 2011). The nonmoving party opposing summary judgment "may not rest upon the mere allegations or denials of his pleading, but ... must set forth specific facts showing there is a genuine issue for trial." Anderson, 477 U.S. at 248. In deciding a motion for summary judgment, a court views the evidence in the light most favorable to the non-moving party, that is, "[t]he evidence of the non-movant is to be believed, and all justifiable inferences are to be drawn in his favor." Anderson, 477 U.S. at 255. At summary judgment, it is inappropriate for a court to weigh evidence or make credibility determinations. Id.

### III.     DISCUSSION

### A.  Gaston County's Motion for Summary Judgment

Gaston County ("Defendant") contends it is entitled to summary judgment on the claims in Counts I and III brought pursuant to 42 U.S.C. § 1983, and in Count IV brought pursuant to the Americans with Disability Act (42 U.S.C. § 12132). (Document No. 102, pp.1-2).

### 1. Count I - Excessive Force / Injunctive Relief

First, Defendant Gaston County argues that summary judgment is appropriate because: "(1) Plaintiff does not state what injunctive relief is sought . . . ; and (2) Gaston County cannot be held liable under § 1983 under a theory of *respondeat superior*." (Document No. 102, p.6). Defendant notes that while Count I states that it is a "Petition for Injunctive Relief," nowhere in Count I or the "Prayer for Relief" does Plaintiff identify what specific activities or actions it seeks to enjoin. Id. See also (Document No. 2, pp.5-7, 11-12). Defendant argues that a complaint must contain "a demand for the relief sought," and that there is no injunctive relief that can be granted. (Document No. 102, pp.6-7) (citing Fed.R.Civ.P. 8(a)(3)).

To the extent Count I alleges actions taken by employees of Gaston County, Defendant argues that there is no *respondeat superior* liability under § 1983. (Document No. 102, p.7) (citing Monell v. Dep't of Soc. Servs., 436 U.S. 658, 691 (1978). Monell provides

> the language of § 1983, read against the background of the same legislative history, compels the conclusion that Congress did not intend municipalities to be held liable unless action pursuant to official municipal policy of some nature caused a constitutional tort. In particular, we conclude that a municipality cannot be held liable *solely* because it employs a tortfeasor—or, in other words, a municipality cannot be held liable under § 1983 on a *respondeat superior* theory.

Monell, 436 U.S at 691.

"Plaintiff's Memorandum Of Law In Opposition…" (Document No. 116) declines to address Defendant's first arguments. Instead, Plaintiff asserts that municipal liability can be

imposed based on either "a deficient training policy or condoned custom or usage theories." (Document No. 116, p.2) (citing <u>Spell v. McDaniel</u>, 824 F.2d 1380, 1391 (4th Cir. 1987). As Defendant notes, Plaintiff has separately asserted an alleged a failure to train in Count III, and thus, Counts I and III are redundant, or Plaintiff is making a *respondeat superior* claim in Count I. (Document No. 102, p.6).

In its "…Reply…," Defendant concludes that Plaintiff's failure to respond to Defendant's arguments indicates that Plaintiff has abandoned Count I of the Complaint. (Document No. 125). Moreover, Defendant re-asserted its argument that Count I was abandoned during oral arguments, and the undersigned does not recall any meaningful rebuttal from Plaintiff's counsel that Count I has not been abandoned.

The undersigned finds Defendant's arguments persuasive and will grant summary judgment as to Count I. To the extent Count I was intended to assert claims of deficient training, customs, or policies, the Court will consider those issues below.

### 2. Count III – Public Entity Liability

Next, Gaston County contends that it is entitled to summary judgment on Count III because: (1) there was no underlying violation, therefore, there can be no §1983 liability as to training; and (2) Gaston County adequately trains its officers on use of force. (Document No. 102, p.8).

Defendant notes that municipal liability can only ensue when an injury is caused by the execution of a policy or custom when that policy or custom is the result of "policymaker fault of at least the degree of deliberate indifference to or reckless disregard for the constitutional rights of persons within police force jurisdiction." (Document No. 102, p.8) (quoting <u>Spell v. McDaniel</u>, 824 F.2d at 1390). Defendant further notes that:

> the Fourth Circuit identified four possible sources of "official policy
> or custom" giving rise to municipal liability: (1) "written ordinances
> and regulations;" (2) "affirmative decisions of individual
> policymaking officials;" (3) omissions by policymaking officials
> "that manifest deliberate indifference to the rights of the citizens;"
> or (4) a practice "so persistent and widespread and so permanent and
> well settled as to constitute a custom or usage with the force of law."

Id. (quoting Carter v. Morris, 164 F.3d 215 (4th Cir. 1999)).

Defendant, citing the "Second Affidavit Of Dave F. Cloutier" and "Defendant's Expert Witness Report of Dave F. Cloutier…" asserts that "GCPD receives training that exceeds the state of North Carolina's requirements." (Document No. 102, p.9); see also (Document No. 101-6, pp.2-4, 13-19). In addition, Defendant's brief includes a summary of the relevant training of the individual Defendants:

> Defendant **Downey** received training from March 16, 2010
> until March 15, 2015, which included: crisis negotiations;
> adult DSS services; rapid deployment; awareness
> surrounding returning military personnel; and responding to
> individuals with mental illness. . . . In that same time frame,
> Defendant **Holder** received training which included: Mental
> Illness: Suicide by Cop and Force Options; Awareness
> Issues Surrounding Returning Military Personnel; and
> Responding to Individuals with Mental Illness. . . .
> Defendant **Knupp** received training including the following:
> Mental Illness: Suicide by Cop and Force Options;
> Awareness Issues Surrounding Returning Military
> Personnel; and Responding to Individuals with Mental
> Illness. . . . Defendant **Earl** received training including: In-
> service Mental Illness: Suicide by Cop and Force Options;
> Awareness Issues Surrounding Returning Military
> Personnel; Responding to Individuals with Mental Illness. .
> . . In addition, Defendant Officers received Basic Law
> Enforcement Training, yearly use of force training, yearly
> firearms training, and yearly legal updates.

(Document No. 102, pp.9-10) (emphasis added and internal citations omitted); see also (Document No. 101-6, p.17).

Defendant further asserts that during discovery it specifically asked, then compelled, Plaintiff to identify alleged deficiencies in training. (Document No. 102, p.10) (citing Document No. 93). Defendant contends that Plaintiff has failed to identify a single specific deficiency in training and failed to produce any witness to testify regarding the alleged lack of training. (Document No. 102, pp.9-10). Defendant notes that Plaintiff alleged in its discovery response that "During Rollcall Training, Defendant Gaston County directs its officers to use deadly force against suicidal individuals." (Document No. 102, p.11) (citing Document No. 101-8, p.3) (citing Document No. 115-11, pp.1-2). According to Defendant, this "accusation" is not supported by evidence because it relies on a test given to officers in June 2000. Id.

Defendant goes on to argue that "a custom or usage cannot be established by proof of a single constitutional violation. Id. (citing Spell, 824 F.2d at 1391).

> As stated above, from March 16, 2010 until March 16, 2015, the Gaston County Police Department responded to 2,386 readily identifiable calls that appear to have involved psychiatric/abnormal behavior/suicide or suicide attempt. Only 0.04% of these calls resulted in a fatal police shooting. . . . Further, the GCPD was not involved in any fatal police shooting, outside of this incident, during the aforementioned timeframe. . . . A single incident does not rise to an unconstitutional custom. *Talley v. City of Charlotte*, 2016 U.S. Dist. LEXIS 96716 *28 (W.D.N.C., July 22, 2016).

Id. (internal citations omitted).

Gaston County concludes that it provided adequate training in both use of force and in encountering people suffering from mental illness and emotional distress, and that Plaintiff has failed to identify any evidence to the contrary. (Document No. 102, pp.11-12).

In her opposition to Defendant Gaston County's motion, Plaintiff first notes that

> Gaston County automatically sends out police officers first for any report of a suicidal subject. Even if a suicidal person or their family member requests that police not respond, Gaston's protocol

mandates that police officers make first contact. Most medical calls
for other conditions do not require a police first response.

(Document No. 116, p.3). Plaintiff contends that this requirement is problematic because it does

not consider the needs of a person suffering mental illness and "abridges and delays the access to

me[n]tal health medical services." Id.

Regarding GCPD training, Plaintiff only references the aforementioned "Suicide by a Cop

Rollcall Training Test" administered to Knupp and Downey during June 2000. (Document No.

116, p.4) (citing Document No. 115-11, pp.1-2). Plaintiff notes that Defendant could not identify

the reference material this test was based on, and contends that it is, at least in part, "inconsistent

with the Constitutional use of deadly force." Id.

In reply, Defendant argues that Plaintiff mischaracterizes the situation here, where officers

were actually responding to a call about a suspect who was allegedly not only suicidal, but

homicidal. (Document No. 125, p.2). Defendant further argues that sending medical personnel to

confront an armed homicidal and suicidal individual would put more people in danger. Id.

Moreover, Defendant notes that Plaintiff has failed to put forth any evidence that Gaston County's

policy is deficient or problematic – no expert opinion testimony and no actual evidence – or, any

authority that the policy violates a statute or constitutional provision. (Document No. 125, pp.2-

3).

Defendant also argues that Plaintiff's suggestion that Gaston County encourages the use of

deadly force, relying solely on a test given in 2000, is an extraordinary claim that ignores the actual

evidence before the Court. (Document No. 125, p.3). For example, Plaintiff does not address the

evidence that there have been no other fatal shootings by GCPD for over five years and 2,386

responses related to suicidal individuals. Id. Moreover, Plaintiff declines to even mention the opinion of Defendant's expert, Dave Cloutier. Id.

The undersigned finds Defendant's arguments compelling and Plaintiff's arguments woefully deficient regarding Gaston County's liability. Apparently, Plaintiff relies on one test administered almost fifteen (15) years before the incident in question as "evidence" that Defendant's policies and training are improper. See (Document No. 115-11). The undersigned is not persuaded that the cited test supports Plaintiff's argument. Notably, the test consists of multiple choice and true/false questions. Plaintiff does not appear to identify any evidence that the test is inappropriate, that the answers given by the officers were scored as correct or incorrect, or that the test accurately represents the policies and training in Gaston County in 2015. Simply put, one fifteen-year old "training test" is not enough to show there is a genuine issue for trial on this issue, particularly where Defendant ignores significant evidence and authority cited by Defendant. See (Document No. 116, pp.2-4). Without more, Plaintiff fails to satisfy its burden of citing specific facts to show there is an issue here for a jury.

To the extent Plaintiff argues that Gaston County's policy of responding to suicidal individuals with police first is unreasonable and/or unconstitutional, Plaintiff fails to cite *any* supporting evidence or authority. The undersigned agrees that especially in an incident such as this, where the suspect is alleged to be armed with multiple weapons, suicidal, and threatening other persons, including police if they are sent – it would dangerous and irresponsible for Defendant to send only medical personnel instead of police officers.

Based on the foregoing, the undersigned will grant Defendant Gaston County's summary judgment as to Count III of Plaintiff's Complaint.

### 3. Count IV - ADA

Plaintiff's remaining claim against Gaston County, though captioned as assault and battery, appears to be intended to allege a violation of the ADA. (Document No. 2, pp.9-11). Specifically, the Complaint alleges that Gaston County discriminated against Mr. Poole on the basis of his disability by failing to: train and supervise agents and employees to recognize and identify mentally ill persons; train and supervise agents and employees to effectively communicate and interact with mentally ill persons; and adopt, implement, and enforce policies and procedures to provide effective communication and interaction with mentally ill persons. (Document No. 2, p.11).

By its motion, Defendant asserts that Plaintiff has again failed to offer evidence to support its allegation that Gaston County failed to provide proper training and/or supervision to its officers regarding mentally ill persons. (Document No. 102, p.12). Defendant then provides the following summary of the applicable law:

> Title II of the ADA requires that all public entities in the United States take affirmative steps to reasonably accommodate qualifying individuals with disabilities, as defined by the statute. 42 U.S.C. § 12132. To make out a prima facie case for a violation of the ADA by a "public entity", Plaintiff must show that: (1) Poole was a qualified individual with a disability; (2) Poole was either excluded from participation in or denied the benefits of some public entity's services, programs, or activities, or was otherwise discriminated against by the public entity; and (3) that such exclusion, denial of benefits, or discrimination was by reason of Poole's disability. *Gohier v. Enright*, 186 F.3d 1216, 1220 (10th Cir. 1999). In the context of arrests, courts have recognized two types of Title II claims: (1) wrongful arrest, where police arrest a suspect based on his disability, not for any criminal activity; and (2) reasonable accommodation, where police properly arrest a suspect but fail to reasonably accommodate his disability during the investigation or arrest, causing him to suffer greater injury or indignity than other arrestees. *Gorman v. Bartch,* 152 F.3d 907, 912-13 (8th Cir. 1998).

(Document No. 102, pp.12-13).

15

Defendant contends that this matter is properly addressed as a reasonable accommodation case. (Document No. 102, p.13). Defendant further contends that Mr. Poole's only qualifying injury/disability involved his back. Id.

Defendant notes that some courts have found situations of exigent circumstances beyond the scope of the ADA's requirement of reasonable accommodation. (Document No. 102, pp.13-14) (citing Hainze v. Richards, 207 F.3d 795, 801 (5th Cir. 2000) (Title II does not apply to an officer's on-the-street responses to reported disturbances or other similar incidents, whether or not those calls involve subjects with mental disabilities, prior to the officer's securing the scene and ensuring that there is no threat to human life) and Thompson v. Williamson County, 219 F.3d 555, 558 (6th Cir. 2000) (if the decedent was denied access to medical services it was because of his violent, threatening behavior, not because he was mentally disabled)). However, Defendant further notes that the Fourth Circuit has held that "while there is no separate exigent circumstances inquiry, the consideration of exigent circumstances is included in the determination of the reasonableness of the accommodation." (Document No. 102, p.14) (citing Seremeth v. Bd. Of Cty. Comm'rs Frederick Cty., 673 F.3d 333, 339 (4th Cir. 2012).

As recognized by Defendant, Seremeth further instructs that the Fourth Circuit is

> reluctant to question the snap judgments of law enforcement officials in situations in which a reasonable officer would fear for his safety and for the safety of those he is charged to protect. . . . The deputies were obligated to assure themselves that no threat existed against them, Seremeth's children, or anyone else.

Seremeth, 673 F.3d at 340.

In this case, Defendant contends that its officers faced an immediate crisis and had to make a split-second decision when Mr. Poole drew a .357 pistol from a waist holster, after being ordered to show his hands. (Document No. 102, p.16). "Poole's violent and deadly decision prevented

Defendant Officers from offering further accommodation." Id. "Deadly force was not used against Poole because of his disability; deadly force was used against Poole because of his actions assaulting police officers with a firearm." (Document No. 102, p.17).

In response, Plaintiff basically re-asserts the argument that Mr. Poole was discriminated against because Defendant responded with police officers instead of paramedics. (Document No. 116, p.5). "[T]here was no valid reason to deny Poole medical treatment and Poole was denied emergency medical services because of his disability." Id. Plaintiff suggests that because Mr. Poole was sitting on a lawn mower and did not have his gun out when police arrived, he should have been afforded the reasonable accommodation of a "trained negotiator rather than physically confronting Mr. Poole." (Document No. 116, p.6).

In reply, Defendant contends that Mr. Poole was not "denied medical services due to a disability;" he "was denied medical services because of his own violent actions." (Document No. 125, p.4). Defendant argues that Mr. Poole was not treated differently than any other citizen; when a suicide call is received, Gaston County dispatches police and medical units. (Document No. 125, p.5). Defendant also notes that Downey testified:

> I was – my main goal was preservation of life, his, mine, Sergeant Knupp's, kids, the neighbors, everybody. What transpired was because of Mr. Poole's action.

Id. (quoting Document No. 124-1, p.10). Defendant concludes that Plaintiff has failed to show he was denied any right because of any alleged disability.

The undersigned finds it noteworthy that on the same day Plaintiff responded to the motion for summary judgment by arguing that Mr. Poole was having a "psychiatric crisis due to his mental disability" and should have been treated by paramedics, she also filed an affidavit stating that Mr. Poole had not expressed any thoughts of suicide, she had no suspicion that Mr. Poole "would harm

himself or others" and "was not threatening to commit suicide," and that he was simply riding his lawn mower to go visit his grandchildren. (Document No. 108-3).

It appears undisputed that Defendant would not have sent anyone to Mr. Poole's address if Mr. Poole had not called the National Veteran's Crisis Line and claimed that he was planning to shoot himself, and possibly others. See (Document No. 26, pp.4-6 and Document No. 101-1, pp.2-3). Plaintiff's argument seems to suggest that Defendants should have focused solely on the information from the Gaston County Communications Dispatcher that Mr. Poole suffered PTSD, and ignored the information that he was heavily armed, threatening suicide, and threatening to harm the police and/or others. See (Document No. 26, pp.4-6 and Document No. 101-1, pp.2-3) Contrary to Plaintiff's sworn affidavit, the crux of Mr. Poole's call to the National Veteran's Crisis Line was that he was threatening harm to himself and others. Id.

Plaintiff also argues that Defendant should have utilized a trained negotiator as an accommodation, while in the same paragraph acknowledging that "Sergeant Downey a trained negotiator was present on the scene." (Document No. 116, p.6).

The undersigned is persuaded that once Mr. Poole drew a .357 pistol, contrary to commands to get his hands up, the officers on the scene reasonably determined under the totality of the circumstances, that the opportunity for accommodation and negotiation had passed. The undersigned finds the following language from the Fourth Circuit instructive:

> Requiring officers to consider ADA compliance in such situations would risk public safety; in *Hainze,* for example, the suspect came toward police across a parking lot, brandishing a knife and refusing orders to halt. *Id.* at 797, 801. Therefore, officers had no duty to accommodate his mental illness before securing the scene and ensuring public safety. *Id.* at 801.
> . . .
> Given the circumstances presented to the officers, however, we conclude that it was unreasonable to expect the sorts of

> accommodations that plaintiff proposes. To say that officers should
> have taken certain other actions during the standoff is to lean far in
> the direction of impermissible hindsight. *See Hainze,* 207 F.3d at
> 801-02. And plaintiff's list of potential responses – summoning
> mental health professionals and family members and administering
> medication – is itself problematic.

Waller ex rel. Estate of Hunt v. Danville, VA, 556 F.3d 171, 175-76 (4th Cir. 2009)

The undersigned finds that Defendant was not required to accommodate Mr. Poole's alleged disabilities.

Based on the foregoing, the Court is convinced that there are no genuine issues of material fact regarding Plaintiff's claims against Defendant Gaston County, and therefore, Gaston County is entitled to judgment as a matter of law.

## B. Individual Defendants' Motion for Summary Judgment

The individual Defendants, now narrowed to Officers W. P. Downey and J. E. Knupp, seek summary judgment on the grounds that they are entitled to qualified immunity and public officer immunity because they acted reasonably and did not violate any clearly defined law or statute. [3] See (Document Nos. 103, p.1; Document No. 104, p.1)); see also (Document No. 132). Defendants note that the Complaint asserts Count II for excessive force, and Count IV for assault and battery, against the individual Defendants. (Document No. 103, p.2). As explained above, the Court has already dismissed the assault and battery claim as to Defendants' official capacity. (Document No. 32).

---

[3] It is clear from the response in opposition that Plaintiff abandoned any claims against Earl and Holder, although those claims were not formally dismissed until almost two (2) months later. See (Document No. 132). To date, Plaintiff has offered little explanation for why Earl and Holder were dismissed other than to say at the hearing that Downey and Knupp were more senior officers. There appears to be no dispute that all four (4) officers reacted essentially the same way to the circumstances on the date in question, and in fact, all fired their weapons at almost the same instant and struck Mr. Poole.

## 1. Qualified Immunity

First, Defendants argue that they are entitled to qualified immunity from Plaintiff's claims. (Document No. 104, pp.6-9). The undersigned finds the following statements by Defendants regarding the applicable law to be instructive.

> It is well-settled that "government officials performing discretionary functions generally are shielded from liability on civil damages insofar as their conduct does not violate a clearly established statutory or constitutional right of which a reasonable person would have known." *Harlow v. Fitzgerald*, 457 U.S. 800, 818, 102 S.Ct. 2727, 2738 (1982); and *Prichett v. Alford*, 973 F.2d 307, 312 (4th Cir. 1992). Qualified immunity protects "all but the plainly incompetent or those who knowingly violate the law." *Malley v. Briggs*, 475 U.S. 335, 341, 89 L. Ed. 2d 271, 278 (1986).

> State government officials performing discretionary functions enjoy qualified immunity from liability for civil damages unless: (1) the officer's conduct violated a federal statutory or constitutional right; and (2) the right was clearly established at the time of the conduct, such that (3) an objectively reasonable officer would have understood that the conduct violated that right. *Knussman v. Maryland*, 272 F.3d 625, 633 (4th Cir. 2001).

> **Qualified immunity is a question of law**. *DiMeglio v. Haines*, 45 F.3d 790, 794-95 (4th Cir. 1995). . . .

> When a plaintiff alleges that a police officer has unconstitutionally used deadly force, **the officer's actions are judged on a standard of objective reasonableness**. *See Graham v. Connor*, 490 U.S. 386, 396-97, 104 L. Ed. 2d 443, 109 S. Ct. 1865 (1989). And in determining objective reasonableness, **the court must consider what a "reasonable officer on the scene" would have done**, taking into account such factors as "the severity of the crime at issue, whether the suspect poses an immediate threat to the safety of the officers or others, and whether he is actively resisting arrest or attempting to evade arrest by flight." *Id.* at 396. Thus,

>> the "reasonableness" of a particular use of force must be judged from the perspective of a reasonable officer on the scene, rather than with the 20/20 vision of hindsight. . . . The calculus of reasonableness must embody allowances for the fact that police

officers are often forced to make split – second judgments – in circumstances that are tense, uncertain, and rapidly evolving -- about the amount of force that is necessary in a particular situation.

*Id.* at 396-97.

(Document No. 104, pp.6-7) (emphasis added).

Defendants contend that when applying the <u>Graham</u> factors here, it is apparent that Defendants acted reasonably. (Document No. 104, p.8). Defendants assert that: (1) they were responding to reports of an armed subject with suicidal and homicidal ideations; (2) Mr. Poole drew a weapon (assault with deadly weapon) on Defendants; and (3) it is undisputed that Mr. Poole disobeyed officers' commands when he drew a pistol and attempted to aim it at Defendants. <u>Id.</u> Moreover, Defendants cite the findings of their expert, *and* Plaintiff's expert, for support that Mr. Poole's actions created a reasonable belief by Defendants of the threat of serious bodily injury that justified firing on Mr. Poole. (Document No. 104, pp.8-9) (citing Document No. 101-6, p.15 and Document No. 101-16, pp.3-4).

"Plaintiff's Memorandum Of Law In Opposition…" asserts that the use of force by Knupp and Downey was "not objectively reasonable." (Document No. 108, p.15) (citing <u>Graham</u>, 490 U.S. at 396-97). Addressing the <u>Graham</u> factors, Plaintiff argues that no crime was committed or alleged and re-asserts that this was a "medical crisis" that required special accommodations. <u>Id.</u> Plaintiff maintains that it was not unusual or illegal for Mr. Poole to carry a gun on his own property, and seems to suggest without explicitly stating, that Mr. Poole drew his pistol in accordance with state law "to give notice to an officer of a concealed weapon." (Document No. 108, p.16). Plaintiff also contends that "Sergeants Knupp and Downey purposely did not attempt to call, wait to negotiate or announce their presence . . ." before confronting Mr. Poole. <u>Id.</u>

Plaintiff further argues that "Poole presented no immediate threat to the safety of the officers." (Document No. 108, p.17). Plaintiff contends that Knupp and Downey had decided to detain Mr. Poole, and that such a detention was improper. Id. Plaintiff contends that Mr. Poole's behavior was "normal and consistent with someone cutting grass." (Document No. 108, p.18) (citing Document No. 111-1, p.11).

Finally, Plaintiff contends that Mr. Poole complied with officers' commands to put up his hands by raising his hands in the air with his gun pointing skyward. (Document No.108, pp.18-19). Plaintiff further contends that Mr. Poole did not resist or elude arrest, rather, he remained seated and stationary on his lawn mower. Id.

Plaintiff then argues that Downey "admits that Poole never pointed the gun at him." (Document No. 108, p.19). However, in the next line of the brief Plaintiff quotes Downey's testimony as follows:

> Q. Ok. Did you ever see Mr. Poole **shoot** his weapon?
>
> A. **No**, I did not. **I saw him pointing it at me or begin to point in my direction**, at which point I fired.

(Document No. 108, p.19) (quoting Document No. 110-5, p.31) (emphasis added).

Despite Plaintiff's brief directly quoting Downey's sworn testimony that he perceived Mr. Poole was pointing or beginning to point a gun in his direction, Plaintiff concludes that a jury must determine whether Mr. Poole was attempting to surrender. (Document No. 108, p.20).

In reply, Defendants argue that Downey and Knupp used a reasonable amount of force. (Document No. 124, pp.6-10). Defendants note that GCPD officers were responding to threats, communicated by Mr. Poole, that he was armed, suicidal, going to give payback to others, and there would be trouble if police arrived. (Document No. 124, p.7) (citing Document No. 101-2,

p.2).  Defendants then note that in contrast to the claim that Mr. Poole never pointed his gun at the officers, all the officers testified that Mr. Poole drew a pistol and then began to point it at the officers.  Id. (citations omitted).

Defendants further argue that Mr. Poole did indeed present a deadly threat when he drew a .357 pistol;  and that Plaintiff's own expert agrees that such action posed an immediate threat. (Document No. 124, pp.8-9) (citing Document No. 101-16, p.4).  Defendants assert that Plaintiff fails to acknowledge that the catalyst for the use of deadly force was Mr. Poole's action brandishing a deadly weapon.  (Document No. 124, p.9).

Finally, Defendants contend that Plaintiff has disingenuously asserted that Mr. Poole was trying to comply with Knupp's commands to "put his hands up" by drawing a pistol and pointing it in the air.  Id. (citing Document No. 108, p.19).  Contrary to the suggestion that there is "significant dispute" about the verbal commands given, Defendants note that there was no command that involved drawing a pistol and pointing it at officers.  Id.  Defendants further note that all the officers who discharged their weapons saw Poole begin to lower his pistol in the officers' direction, and that no competent evidence has been submitted to the contrary.  (Document No. 124, p.10).

> To reiterate, the uncontested facts in this matter are that GCPD officers were dispatched to Poole's residence after he reported he was armed, suicidal, going to harm others, and become violent with the police should they respond.  When officers arrived, Defendant Downey instructed them to form a perimeter to try to locate Poole and assess the situation.  When he was observed outside, away from his claimed cache of firearms and any potential hostage, it was decided to make contact with Poole.  When Defendant Knupp gave Poole commands, Poole ignored said commands and drew a pistol. Seeing Poole brandish a weapon, Defendant Downey instructed Poole not to point the gun at them.  Despite this command, Poole began lowering the firearm in their direction, which resulted in them discharging their firearms.

Id. Defendants conclude that all the officers are entitled to qualified and public officer immunity as to each of Plaintiff's claims. Id.

The Court finds Defendants' arguments most persuasive. Moreover, Plaintiff's arguments in opposition are often inconsistent with the established evidence or lacking factual support. For example, Plaintiff argues that "Poole never pointed his weapon at the officers." (Document No. 108, p.17). However, all four of the individual Defendants have testified that Mr. Poole pointed, or began to point, his weapon at the officers, just before they each decided to discharge their weapons toward him. Plaintiff has presented no evidence to contradict the officers' sworn testimony.

At most, Plaintiff relies on a statement written and notarized by Plaintiff's counsel, and signed and edited by Mr. Poole's neighbor, J. C. Dowell, Jr. Mr. Dowell's statement – which is problematic for several reasons, not least of which that he died soon after giving it and before Defendants had a chance to cross-examine him – seems to be relied upon by Plaintiff mainly to "show" that Mr. Poole did not have or draw a weapon. (Document No. 113-1). However, Plaintiff's brief now acknowledges that not only did Mr. Poole have a weapon, but that he drew a pistol and pointed it in the air. (Document No. 108, p.10). Mr. Dowell allegedly claimed that Mr. Poole had some object in his hand, but it was not a gun. Id. See also, Bell v. Dawson, 3:99-CV-316-H, 144 F.Supp.2d 454, 461-62 (W.D.N.C. 2001) (citing Anderson v. Russell, 247 F.3d 125, 130 (4th Cir. 2001) ("minor discrepancies between the officers' versions of events and that of other witnesses do not create a triable issue of fact"). Dowell's affidavit is contradicted by Plaintiff's factual summary and Plaintiff's own affidavit. (Document No. 108 and Document No. 108-3).

It also appears to the undersigned that Plaintiff has failed to adequately apply relevant authority to this case which instructs that we must judge the reasonableness of the force used "from the perspective of a reasonable officer on the scene, rather than with the 20/20 vision of hindsight." Graham, 490 U.S. at 396;  see also Anderson, 247 F.3d at 129-30 ("The Court's focus should be on the circumstances at the moment force was used . . . .  Given the uncontroverted evidence as to what [Defendant Officer] perceived immediately before firing, we do not believe that there is a legally sufficient evidentiary basis for a rational jury to find for [Plaintiff] on the issue of excessive force.") and McVay v. Jackson Cty. Sheriff's Dept., 2:06-CV-003-GCM, 2006 WL 2987081, at *1 (W.D.N.C. 2006).

Plaintiff has failed to adequately argue, or identify any evidence supporting a conclusion, that a "reasonable officer" would have responded differently than Defendants.  Instead, Plaintiff's opposition mostly engages in the type of hindsight that the courts say is impermissible - if Gaston County had sent only medical services, things would have been different; or if GCPD had carried different weapons, worn different uniforms, or approached Mr. Poole in another manner, maybe the outcome would have been better.

Here, the admissible evidence, including the testimony of the four (4) officers closest to Mr. Poole and the unfolding scene, shows that there was indeed a "tense, uncertain, and rapidly evolving" situation that required split-second judgments.  See Graham, 490 U.S. at 397.  That evidence further shows that from the perspective of *all* the officers on the scene, Mr. Poole failed to obey their commands, drew a pistol, and was beginning to lower that weapon in the officers' direction.  "This Circuit has consistently held that an officer does not have to wait until a gun is pointed at the officer before the officer is entitled to take action."  Anderson v. Russell, 247 F.3d 125, 131 (4th Cir. 2001).  Applying Graham, and noting that each of the officers had essentially

the same perspective, *and* the same reaction, the undersigned finds that the use of force here was reasonable.  See Seremeth, 673 F.3d at 340 ("we are reluctant to question the snap judgments of law enforcement officials in situations in which a reasonable officer would fear for his safety and for the safety of those he is charged to protect")

Certainly the result here was tragic.  But, Plaintiff has failed to show there is a genuine issue for trial regarding the reasonableness of the officers' use of force.  As noted above, the nonmoving party opposing summary judgment "may not rest upon the mere allegations or denials of his pleading, but ... must set forth specific facts showing there is a genuine issue for trial."  Anderson v. Liberty Lobby, 477 U.S. at 248.  Like the Fourth Circuit in Anderson, the undersigned does not believe there is "a legally sufficient basis for a rational jury to find for [Plaintiff]."

Based on Defendants' arguments and relevant authority, the undersigned agrees that the Defendant officers are entitled to qualified immunity and judgment as a matter of law on all claims against them.   As such, it is not necessary for the Court to analyze Defendant's alternative claim for immunity, but the undersigned will briefly address public officer immunity.

## 2.  Public Officer Immunity

Again, Defendants have provided a helpful summary of the relevant law.

> The purpose of public official/officer immunity is to protect officers, like Defendants, from individual liability when performing their official duties.  **The test is whether Defendants actions were without malice and were reasonable given the circumstances**.  *Turner v. City of Greenville,* 197 N.C. App. 562, 566 (2009) (citations omitted).
>
>> In this jurisdiction an official may be held liable when he acts maliciously or corruptly, when he acts beyond the scope of his duties, or when he fails to act at all.  As long as a public official lawfully exercises the judgment and discretion with which he is invested by virtue of his office, keeps within the

scope of his official authority, and acts without malice or corruption, he is protected from liability.

*Id.* (citations omitted).

"A defendant acts with malice when [1] he wantonly does that which a man of reasonable intelligence would know to be contrary to his duty and [2] which he intends to be prejudicial or injurious to another." *In re Grad v. Kaasa,* 312 N.C. 310, 313, 321 S.E.2d 888, 890 (1984). Meaning, Plaintiff must establish facts that pierce the cloak of official immunity of the public official/officer, i.e., something more than mere negligence. *Turner*, 197 N.C. App. at 566. The analysis is the same as the §1983 analysis, whether Defendants actions were reasonable.

In North Carolina, a law-enforcement officer is justified in using deadly physical force upon another person "[t]o defend himself or a third person from what he reasonably believes to be the use or imminent use of deadly physical force." N.C.G.S. § 15A-401(d)(2)(a).

(Document No. 104, pp.10-11) (emphasis added).

As explained above, the Court has already determined that the Defendant officers' actions were reasonable under the circumstances underlying this case. Moreover, Plaintiff's argument that Defendants acted with malice is without merit. (Document No. 108, pp.11-15). Plaintiff has failed to identify any evidence that Defendants acted maliciously or corruptly. In fact, at least part of Plaintiff's argument is nonsensical: Plaintiff alleges Defendants were reckless and malicious when they failed to use a negotiator, while also acknowledging that "Sergeant Downey was a team leader for the crisis negotiation unit." (Document No. 108, pp.11-12).

In short, the Court agrees that Defendants are entitled to public officer immunity.

**C. Motion to Strike Dowell Affidavit**

The final motion before the Court is Defendants' motion to strike the affidavit of J.C. Dowell mentioned above. (Document No. 123). Under the circumstances, the undersigned finds

that the motion to strike is moot because the "Dowell Affidavit" does not meaningfully help Plaintiff's arguments in opposition to summary judgment, or alter the Court's analysis. Defendants seek to strike Dowell's affidavit as a hearsay statement "intended to prove that Mr. Poole was unarmed when Poole was shot." (Document No. 123, p.3).

The undersigned is not persuaded that the "Dowell Affidavit" (Document No. 113-1) is admissible evidence; however, even if it is admissible, the undersigned does not find that it would change the Court's conclusion. Mr. Dowell's affidavit is largely consistent with the Defendants' account of the underlying events. (Document No. 113-1).

Although Mr. Dowell was at his home, a significantly greater distance from the scene than Defendant officers, he also heard the officers command Mr. Poole to "Get Your Hands Up." (Document No. 113-1); see also (Document No. 127, pp.1-2) (citing Document No. 115-9) ("Dowell's trailer is directly across the street from Decedent's trailer"). Dowell further states that Mr. Poole began to raise his hands, and that he had something in his hand. Id. Mr. Dowell's statement asserts that it was not a gun in Mr. Poole's hand, but fails to identify what was in his hand. Id. Other than stating he did not have a gun in his hand, Dowell's statement does not meaningfully contradict Defendants' versions of events. See Anderson v. Russell, 247 F.3d at 130-31 ("In a rapidly evolving scenario such as this one, a witness's account of the event will rarely, if ever, coincide perfectly with the officers' perceptions because the witness is typically viewing the event from a different angle than that of the officer. For that reason, minor discrepancies in testimony do not create a material issue of fact in an excessive force claim, particularly when, as here, the witness views the event from a worse vantage point than that of the officers.").

Notably, Plaintiff has failed to offer any evidence of what other object Mr. Dowell might have seen in Mr. Poole's hand. Moreover, Plaintiff has since acknowledged that Mr. Poole was carrying a gun, and has not disputed that his .357 pistol was found under or near his body after he was shot. <u>See</u> (Document No. 108-3). In fact, Plaintiff's factual summary in "Plaintiff's Memorandum Of Law In Opposition To Defendants'… Motion For Summary Judgment" seems to accept that Mr. Poole had drawn his weapon and raised it in the air. (Document No. 108, p.10).

Even when the Court considers Mr. Dowell's statement in the most favorable light to Plaintiff, the undersigned is not convinced it creates a triable issue of fact. <u>See Anderson v. Russell</u>, 247 F.3d 125. Defendants' evidence, and Plaintiff's own filings, show that Mr. Poole was armed with a .357 pistol, which was drawn from his holster, and that Defendants reasonably feared imminent serious bodily injury to themselves and each other. All the officers have testified that Mr. Poole pointed, or began to point, his pistol at them; however, even if he did not point the pistol at them, the Fourth Circuit has held that "an officer does not have to wait until a gun is pointed at the officer before the officer is entitled to take action." <u>Anderson v. Russell</u>, 247 F.3d at 131.

Based on these facts and authority, the undersigned will deny the motion to strike as moot.

## IV.    CONCLUSION

**IT IS, THEREFORE, ORDERED** that "Defendant Gaston County's Motion For Summary Judgment" (Document No.101) is **GRANTED**.

**IT IS FURTHER ORDERED** that the "Motion For Summary Judgment Of Defendants J.E. Knupp, W.P. Downey, T.R. Earl, and A.O. Holder" (Document No. 103) is **GRANTED**.

**IT IS FURTHER ORDERED** that "Defendants' Motion To Strike Affidavit Of J.C. Dowell, Jr. [#113-1]" (Document No. 123) is **DENIED AS MOOT**.

**SO ORDERED**.

Signed: October 6, 2017

David C. Keesler
United States Magistrate Judge